**BOY SCOUTS OF AMERICA, a corporation, et al.**

v.

**Fred W. TEAL and Havertown Sea Scouts, Inc., a corporation.**

**Civ. A. No. 72-2319.**

United States District Court, E. D. Pennsylvania.

April 23, 1974.

Louis J. Di Giacoma, of Phillips, Curtin, & Di Giacomo, Philadelphia, Pa., for plaintiff.

I. Leonard Hoffman, of Ettinger, Poserina, Silverman, Dubin, Anapol & Sagot, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

HIGGINBOTHAM, District Judge.

If a review were made of every civil suit filed in the last five decades, it is improbable that one could find a case which presents less merit than defendants' defense and defendants' counterclaims. The Boy Scouts of America (hereinafter referred to as "BSA") has brought this action against the Havertown Sea Scouts, Inc., a purported youth organization not affiliated in any way with BSA or the Sea Scouting Program, operating in and around Havertown, Pennsylvania; it has also brought suit against the "leader" President of the Havertown Sea Scouts, Fred W. Teal. The BSA seeks to enjoin defendants from representing themselves as associated with or approved by the BSA, and from using words, names, uniform and insignia which are commonly used by or identified with BSA, and to which BSA has a statutory and common law protection against infringement. BSA does not seek to prohibit defendants from conducting their program of youth activities as long as they refrain from misrepresenting themselves as a "Scout" organization and "Scout" leader in the course of such activities.

Extensive discovery has been conducted by the parties. Plaintiff has filed a Motion for Judgment on the Pleadings under Fed.R.Civ.P. 12(c), or in the alternative a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56(c). After a careful review of the briefs, depositions and an important *in camera* document marked Court's Exhibit No. 1, plaintiff's motion for injunctive relief against defendants is granted and plaintiff's motion for summary judgment and the dismissal of defendants' counterclaims are granted.

I.

### FINDINGS OF FACT

1. Prior to January 31, 1971, Explorer Unit 792, known as "Sea Explorer Ship 792" was an Explorer unit of BSA, located in Havertown, Pennsylvania, and operating under the jurisdiction of the Valley Forge Council of BSA.[1]

---

1. Valley Forge Council is a separately incorporated local Council of BSA responsible for supervising BSA programs in its area.

2. Defendant Teal was registered with BSA as a unit leader ("skipper") of Sea Explorer Ship 792.

3. The Charter from BSA to Sea Explorer Ship 792 (registered in the name of American Legion Post 338) expired on January 31, 1971, and was not renewed.

4. Teal's BSA registration as unit leader likewise expired on January 31, 1971, and he has not since been re-registered with BSA nor is he now a member of or otherwise affiliated with BSA. BSA has not granted Teal authorization to use any of BSA's emblems, insignia, descriptive or designating marks or words and phrases.

5. During the pendency of their dispute with BSA, commencing January 31, 1971, Teal has been leader and "skipper" of a nonprofit youth organization known as Havertown Sea Scouts, Inc., which was incorporated in Pennsylvania by Teal in 1972. Teal and Havertown Sea Scouts, Inc., have employed the designation "Ship 792" and since January 31, 1971, they have used other emblems, insignia, descriptive or designating marks or words and phrases of BSA.

6. Congress has granted BSA:

" * * * the sole and exclusive right to have and to use, in carrying out its purposes, all emblems and badges, descriptive or designating marks, and words and phrases now or heretofore used by the Boy Scouts of America in carrying out its program * * * " 36 U.S.C. § 27.

7. In late 1970 Teal received notice from the sponsor of Sea Explorer Ship 792 (American Legion Post 338) that it no longer woud act as a sponsor of the unit. Since then there have been no other official sponsors. The other applications made, if any, were only oral, and Teal has no direct knowledge of such applications.

8. Teal received notice from Valley Forge Council that his position as a volunteer Scout leader was terminated in late 1970.

9. After the expiration of the charter of Sea Explorer Ship 792 on January 31, 1971, Teal continued to operate his group basically as before. He continued the use of Sea Scout uniforms, he continued to wear BSA insignia, he continued to issue BSA badges and emblems to the boys in the unit and BSA hats to his staff and he continued to use BSA stationery until he exhausted his supply late in 1971.

10. Teal admitted the authenticity of various documents using the words "Scouts", "Ship 792", and the like, including a letter on BSA stationery dated June 27, 1972, over his signature. These documents include correspondence with the United States Navy in his effort to acquire a 190 foot ship, the PCE "Portage", the solicitation of Navy training films, handbills referring to the USS "Portage", an advancement card signed by Teal, and general mailing forms bearing the Scout emblem and referring to "Sea Scouts" when soliciting new members.

## II.

### DISCUSSION

█ It is unnecessary to repeat the extensive citations of authorities in plaintiff's brief. I find that defendants' conduct infringes BSA's rights as granted by Congress and established by the common law, and that it constitutes actionable misrepresentation and unfair competition, which may be enjoined and is the basis of an action for damages. Girl Scouts of United States of America and Boy Scouts of America v. Hollingsworth, 188 F.Supp. 707 (E.D.N.Y.1960) (summary judgment granted); Boy Scouts of America v. Winchester Repeating Arms Co., 15 T.M.Rep. 142; In re Boy Explorers of America, 21 Misc.2d 114, 67 N.Y.S.2d 108 (S.Ct.N.Y.Co. 1946); Boy Scouts of America v. Ulster Knife Co., 47 N.Y.S.2d 750 (S.Ct.N.Y. Co.1944); In re American Naval Scouts, 1927 N.Y.Op.Atty.Gen. 225.

That Congress intended to restrain precisely the sort of conduct engaged in

by defendants is manifested by the following statement from the Congressional Report in support of the BSA Incorporation Act:

"If any boy can secure these badges without meeting the required tests, the badges will soon be meaningless, and one of the leading features of the scout program will be lost. Likewise, with the uniform which designates the scout. At the present time this is protected by the use of insignia—a seal woven or stamped into the cloth. All of these various badges and insignia are at present protected by the patent laws, but under the patent laws such protection is available for a limited period only. The passing by Congress of this bill will, it is believed, provide the organization with proper protection for its distinctive insignia, the integrity of which is essential to the maintenance of the movement, and protect it from those who are seeking to profit by the good repute and high standing and popularity of the scout movement by imitating it in name alone." H.R.Rep.No.130, 64th Cong., 1st Sess., at 2 (1916).

Moreover, even before the incorporation of the Boy Scouts of America, the words "Scout" or "Boy Scout" had acquired a secondary meaning in applying to the Boy Scout Movement. Adolph Kastor & Bros. v. Federal Trade Commission, 138 F.2d 824, 825 (2d Cir. 1943). In *Kastor's*, the United States Court of Appeals for The Second Circuit affirmed the FTC's injunction of the use of the mere word "Scout" by a third party which had utilized the word for over 30 years in its manufacture of knives. Judge Learned Hand stated the Court's *ratio decidendi* as follows:

" * * * the decision turns upon whether the suggestion—to put it no more strongly—from the name,

'Scout,' upon a boy's pocket knife that the Boy Scouts of America sponsor it as proper for Boy Scouts, is enough to support the order. We hold that it is; that the Boy Scouts have a cognizable interest in preventing such possible confusion." *Id.* at 825.

Here virtually every indicium of Scouting is being misappropriated by defendants in representing themselves to the public, to contributors and even to the United States Navy, as a recognized Sea Scout unit. The one and only defense proffered for such wrongful conduct is that Teal and Sea Explorer Ship 792 were allegedly unlawfully terminated by BSA.

As to the allegation that the status of Teal's organization, Sea Explorer Ship 792, was unlawfully terminated, I find that neither defendant Teal nor Sea Explorer Ship 792 had received the necessary local approvals (See Hooper Affidavit ¶8; cf. pp. 13–16) that would have made re-registration possible under BSA's By-Laws.

BSA cannot risk the possibility that youngsters involved in Scouting will be placed under the supervision of irresponsible persons. The means by which BSA minimizes this risk is described fully in the Hooper Affidavit (¶¶5–7) and in BSA's By-Laws (Exhibits C and D, respectively). In essence, responsible leadership is guaranteed by the annual requirement that, first, a sponsor applies for registration; secondly, a local council approves the application; and, thirdly, BSA itself approves. In the present case, the two local levels, having become aware of information [2] raising serious doubts as to defendant Teal's leadership, made no application for renewal. BSA (national), having received no application for renewal allowed the registration of Sea Explorer Ship 792 and of Teal to lapse automatically on

2. See Court's Exhibit No. 1. Even exclusive of the impounded documents, plaintiff appropriately does not mince its words about Teal's purported reputation as a homosexual which " . . . had apparently spread throughout the community since 1968." (Plaintiff's brief, p. 22.) Even if I had to make a finding exclusive of the impounded document, it would be adverse to defendant Teal.

January 31, 1971. BSA did not thereby violate any provision of its Charter or By-Laws which alone govern the rights, obligations and remedies between Teal and the BSA. See generally, Parsons College v. North Central Assn. of Colleges and Secondary Schools, 271 F. Supp. 65, 70–71 (N.D.Ill.1967) and Chapman v. American Legion, 244 Ala. 553, 14 So.2d 225 (1943). BSA, never having entered into any association with defendant Havertown Sea Scouts, Inc., owed no duty to said defendant.

Defendants' counterclaims are for slander. However, they allege not that BSA slandered Teal, but rather that BSA "and/or" Valley Forge Council personnel did. (Teal Counterclaim ¶4). Since the Valley Forge Council is a separate corporation with its own staff and independent authority, the question whether anyone from BSA itself slandered Teal is crucial. Counsel for BSA tried to answer this question in Mr. Teal's deposition.

In his responsive testimony, Teal was able to specify numerous occasions on which alleged slanders had been published against him by personnel of the Valley Forge Council (pp. 68–74). He was able to state that such alleged slanders commenced as early as August 1968 (p. 75); that they had been made to, among others, the minister of his church (p. 70) and to members of a local Lions Club (p. 71).

In contrast, Teal has been able to suggest only two occasions in which he may have been discussed by a representative of BSA itself. (See pp. 75–84.) In response, to the direct question whether statements had been made by anyone in BSA itself, Teal responded "I have no way of knowing for sure" (p. 75).

The only two possible incidents of slander recalled by Teal were as follows:

(1) An alleged conversation in 1971 had by a Mr. Joseph Dwyer in which Teal was described as a homosexual and which caused Dwyer to pull his two sons out of the youth program being run by Teal (p. 83); and

(2) An alleged conversation with a "Mr. O'Connor" (otherwise unidentified) that purportedly took place in March, 1973 (p. 78). Teal admitted that he never met "O'Connor" and "only knew this through other contacts" (p. 75). Teal further stated that "O'Connor", inquiring on behalf of his son, was "told by the National Council [of BSA], whoever he talked with, that the unit was not officially chartered and there were suspicions about the leadership there" (p. 76). Despite repeated requests, including one at the deposition (p. 80), Teal has not been able to further identify "O'Connor".[3]

Here we have a man (Teal) whose reputation of homosexuality had apparently spread throughout the community since 1968. Whether this reputation was accurate or not, whether it was started by Valley Forge officials or by others, is not relevant to this case. There certainly was no statement by Teal that it was started by anyone in the national BSA employ.

■ Finally, not only was Teal unable to identify the BSA personnel involved, but his own testimony establishes that his claim fails as a matter of law. Although BSA denied that any actionable statements occurred, Teal's testimony manifests that the alleged statements in any event fall within the category of a qualified privilege. This doctrine was described as follows in Williams v. Kroger Grocery & Baking Co., 337 Pa. 17, 19–20, 10 A.2d 8, 9 (1940):

" 'A statement made in good faith relating to a subject in which the person making the communication is interested or in regard to which he has a social or moral duty, when made to one having a like interest or duty is privileged * * *, Nagle v. Nagle,

3. Defendants recently filed pretrial memorandum lists a "Mr. Connors" with address unknown as a witness.

316 Pa. 507, 512, 175 A. 487, 489.
\* \* \* ' ' ' "

The only two statements alleged to have been made by BSA personnel were made in response to inquiries (p. 75), one in 1971 and the other in 1973, by the fathers of boys who were considering joining the Teal "Scout" unit. Assuming *arguendo* that a remark had been made suggesting suspicions regarding Teal, the responsible BSA official would have been entitled, under the circumstances, to report Teal's reputation as he knew it, so long as he had probable reason for believing it to be true. Certainly, a reputation, in existence for this amount of time, supported by a police report including sworn statements of three boys, in a context where suit had previously been started and abandoned, would give such official sufficient reasonable cause to believe in the veracity of Teal's reputation.

Despite his counsel's vigorous assertions, there is no doctrine of law which could require a responsible organization like the Boy Scouts to accept individuals in leadership roles who have questionable character even though the Boy Scouts could not establish a prior conviction or produce proof beyond a reasonable doubt. The future of its youth is a nation's most precious asset; yet by definition the young are frail, vulnerable and malleable. Their future strength may well be dependent upon whether they are exposed to positive leadership or abusive exploitation. Even liberal spirits would not confuse the different milieus of a criminal case and the prerequisite proof associated therewith with the educational setting of a private organization such as the Boy Scouts of America. I am not unaware of some of the classic civil rights cases mentioned by defendant's counsel at oral argument. Yet I do not find that those civil rights cases assuring blacks equal options have any precedential value in establishing for a purported homosexual any constitutional right to run a Boy Scout Troop. Bluntly, blackness and homosexuality are not the same phenomenon.

## III.

### CONCLUSIONS OF LAW

(1) Defendants have admitted not only that BSA has the sole and exclusive right to emblems, badges, words, marks and phrases associated with BSA, but that defendants, operating under the name Havertown Sea Scouts-Ship 792, have used such emblems, badges, words, marks and phrases in violation of such rights despite the fact that Sea Explorer Ship 792 and Teal are no longer affiliated with BSA. Without more, such conduct infringes BSA's rights as granted by Congress and established by the common law, and constitutes actionable misrepresentation and unfair competition, which may be enjoined and is the basis of an action for damages.

(2) Congress intended to restrain precisely the sort of conduct engaged in by defendants.

(3) Defendants' claims on the facts of this record constitute neither a cause of action against plaintiff nor a meritorious defense to plaintiff's claim.